TOUSSAINT CHENE *et al. v.* THE PRESIDENT, DIRECTORS AND COMPANY OF THE BANK OF MICHIGAN.

Under the act of Congress of March 3d, 1807, entitled, " An act regulating the grants of land in the Territory of Michigan," which provides, that the fee simple of every tract or parcel of land that was settled, occupied and improved, prior to the first day of July, 1796, should be granted to the person or persons in the actual possession, occupancy, and improvement thereof;—*it was held,* that the act recognised no right in claimants but that of occupancy or possession, as the stock in which the fee was to be ingrafted; and that where three brothers, on the death of their father, claimed a tract of land under a "substitution," or kind of entailment, by which the land belonged to the eldest son his lifetime, and after his death to the second son his lifetime, &c., the eldest son, under the claim set up by the brothers, being entitled to the occupancy or possession in his own right, to the exclusion of his brothers, was also entitled to the fee simple in his own right, under the act of Congress; and that, having presented his claim, and procured its allowance, and obtained a patent for the land, there was not a resulting trust in favor of his brothers.

ABOUT the year 1802, one Charles Chene, a resident of Detroit, died in possession of a farm constituting the front of what is now known as the De Garmo Jones farm, west of the city. He left three sons,—Pierre, the eldest, Toussaint, the second, and Gabriel,—and one daughter. Pierre continued in possession of the farm after his father's death, and, some three or four years after, purchased a farm above the city, now known as the " Chene farm," of one Joseph Serre, surnamed St. Jean, and took a conveyance of it in his own name. About the same time, the three sons conveyed all their interest in the De Garmo Jones farm to one Antoine La Selle. Toussaint went into possession of the St. Jean farm, and cultivated the same for two years, dividing the produce with Pierre; when, in consequence of some misunderstanding between them, a fence was run through the farm, dividing it into two parts; and Toussaint continued to occupy and cultivate the north-

east half, and Pierre took possession of, and cultivated the other half. The fee of both the De Garmo Jones farm and the St. Jean farm was in the government.

By an act of Congress, entitled "An act regulating the grants of land in the Territory of Michigan," approved March 3d, 1807, it was provided that the fee simple of any tract or parcel of land, that was settled, occupied and improved, prior to the first day of July, 1796, should be granted to the person or persons in the actual possession, occupancy and improvement thereof; and commissioners were appointed for the purpose of ascertaining and deciding on the rights of persons claiming the benefit of the act. Pierre presented a claim for the whole of the St. Jean farm, to the commissioners, for confirmation, by whom his claim was allowed; and he obtained a patent for the land in 1811. In August, 1818, Pierre sold the half of the farm in possession of Toussaint to one Godfroy, who subsequently sold it to the defendants. Toussaint died in possession of the premises in 1834, and, soon after his death, an action of ejectment was brought by defendants, in which they recovered a verdict; when complainants filed their bill to restrain further proceedings at law, and claiming a resulting trust in their favor, under the deed from St. Jean to Pierre Chene.

It is unnecessary to make a more full statement of the case, as the remaining facts are sufficiently set forth in the opinion of the Court.

*A. W. Buel*, for complainants, contended that the St. Jean farm was purchased out of the proceeds of the Jones farm; and, the deed having been taken in Pierre's name, there was a resulting trust in favor of Toussaint and Gabriel. That Pierre wrongfully obtained the patent in his own name.

*G. E. Hand*, for defendants, insisted there was no resulting trust growing out of the sale of the Jones farm, and purchase of the St. Jean farm; that the grant from government was a mere gratuity; and that the action of the commissioners was conclusive in the matter.

THE CHANCELLOR. The act of Congress, under which the St. Jean farm was confirmed to Pierre Chene, makes the right of occupancy, or possession, the basis of confirmation. It provides that, to every person or persons in the actual possession, occupancy, and improvement of any tract or parcel of land, in his, her, or their own right, at the time of passing the act, and which tract or parcel of land was settled, occupied, and improved, by him, her, or them, prior to and on the first day of July, 1796, or by some other person or persons, under whom he, she, or they, hold or claim the right to the occupancy or possession thereof, and which occupancy or possession has been continued to the time of passing the act, the tract or parcel of land, thus possessed, occupied, and improved, shall be granted, and such occupant or occupants shall be confirmed in the title to the same, as an estate of inheritance in fee simple. *Act of March 3d*, 1807, *Sec.* 2.

Possession or occupancy was a good title against all the world, except the government, which held the fee simple. Government recognised this right of possession, and made it the consideration of granting the fee. And, if Pierre Chene, when he obtained a confirmation to himself of the St. Jean farm, held the occupancy or possession of the whole, or any part of it, under the deed from St. Jean, in trust for his brothers Toussaint and Gabriel, he, in equity, continued to hold the title in trust for them after the confirmation. For no principle is better settled, than that a trustee shall not be allowed to make any advantage to

himself from an abuse of his trust. The law will not even allow him to renew a lease for his own benefit, where the lessor has refused to renew it for the benefit of the *cestui que trust*. *Keech* v. *Sandford*, 3 *Eq. Ca. Ab.* 741.

There is nothing in the act of Congress, under which the title was confirmed to Pierre Chene, to prevent the operation of this equitable principle. Great injustice might be done, if courts of equity were precluded from the exercise of their ordinary jurisdiction in such a case; and the act of Congress itself be made the means of vesting a title in a person for whom it was not intended.

It is not rejudging what the commissioners have done, as in the case of adverse claimants. If Pierre held the right of possession under the deed from St. Jean, in trust for Toussaint and Gabriel, his possessory title was their title; and a confirmation of such title, by the commissioners, a confirmation of their title. The two were consistent; and not inconsistent, as is the case with adverse titles which, being inconsistent, destroy each other.

Nor is there any thing in the nature of the conveyance from the government, it being a patent, to shut out the inquiry. Equity does not question the legal title in such cases, but lays hold of it for the *cestui que trust*, to prevent injustice. It is a well settled principle of law, that, where a deed is taken in the name of A., and the consideration is paid by B., a trust results in favor of the latter. Suppose the grantor to be the government, will that alter the case? Certainly not; for it is immaterial who the grantor is, whether he be an individual or the government, and whether the conveyance be a patent or the deed in common use.

This brings us to the question whether there was a resulting trust in favor of Toussaint and Gabriel, as to the possession under the deed from St. Jean to Pierre Chene.

On this complainants rest their claim to the premises in question.

The bill states, that Charles Chene, the father of the three brothers, died about the year 1806, in possession of, and having *a certain equitable title* to the front part of what is now called the De Garmo Jones farm; and that, *upon his decease, such title passed and belonged to his male children*, the said Pierre, Toussaint, and Gabriel. By *a certain equitable title*, is meant the possession or occupancy of the land. But how, or in what way, this title, on the death of Charles Chene, *passed and belonged to his male children*, the bill does not state, but leaves us in the dark. It is certain, however, the brothers, after their father's death, did not claim the Jones farm by descent; for they had a sister then living, and, by the ordinance of 1787, she would have been entitled to an equal share with them, as tenants in *common; yet there is no mention made of her interest*, and she did not join in the deed to La Selle. Moreover, this deed, signed by the brothers and La Selle, shows the Jones farm came to the Chene family from one Tetard; alias Forville; and that the brothers claimed it under a *substitution*, as it is called in the deed, or kind of entailment. The part of the deed to which we refer more particularly, is in these words:

"And the said Pierre Chene, Toussaint Chene, and Gabriel Chene, warrant unto the said Antoine La Selle, his heirs and assigns hereafter, the said premises as aforesaid, against all gifts, dowers, debts, mortgages, evictions, alienations, *substitutions*, and of all hindrances, of all incumbrances whatsoever. And, as a security for the said warranty, they mortgage unto the said Antoine La Selle, his heirs and assigns hereafter, all their present and forthcoming property, and more particularly the farm or plantation which Pierre Chene recently purchased from Joseph

Serre, surnamed St. Jean, lying and situate at the Grand Marais, in the district of Detroit, containing five arpents in front, by forty in depth, together with the buildings thereon erected. Also the orchard, fences, and dependencies thereunto attached. This additional guarantee is to secure the said Antoine La Selle, his heirs and assigns hereafter, against all claims of the aforesaid Chenes, and of their heirs hereafter, by virtue of a *substitution said to have been made by Tetard, alias Forville, of the said land as above sold, to the eldest of the male children of the family of the said Mess. Chene:* and also against an annual unredeemable rent of two pounds, New York currency, for which the said land stands charged. *The said Pierre Chene and his said brothers, declaring by these presents that they intend transferring said substitution, and the said rent chargeable on said land that the said Pierre Chene has lately purchased of the said Joseph Serre, surnamed St. Jean, situate at Grand Marais as above mentioned.*"

Here then we have the *substitution,* under which the brothers claimed the Jones farm, transferred by them to the St. Jean farm, purchased in the name of Pierre. We say purchased in the name of Pierre, as we are satisfied from the evidence the St. Jean farm was purchased with the proceeds of the sale of the Jones farm to La Selle.

Toussaint never set up any other claim to the St. Jean farm than that growing out of the substitution. Abraham Fournier, a brother-in-law to Toussaint, with whom he was in the habit of almost daily intercourse, and one of complainants' witnesses, says, both before and after the sale to Godfroy he had frequent conversations with Toussaint, and asked him why he did not make some arrangement with Pierre, if he was entitled to part of the farm; otherwise Pierre would sell it and eat him up: to which Toussaint replied, "*he could not sell it,* because the farm

belonged to the Chene family, and that it was given to the Chene family from father to son; and that it belonged to *Pierre during his life,* and after that to Toussaint, and then to Gabriel."

In the deed to La Selle, and Fournier's testimony, we have evidence of two facts: that the brothers claimed the St. Jean farm under the substitution; and that, by the substitution, Pierre Chene had a life estate, while the other brothers had an estate in expectancy only.

That Toussaint claimed an estate in expectancy, and not in possession, (except so far as he was allowed by Pierre to live on a part of the farm, and cultivate it for the benefit of himself and family,) is proved by other facts. When Charles Chene died, Pierre, the eldest of the brothers, was left in sole possession of the Jones farm. There is no evidence his brothers occupied, or claimed a joint occupancy, with him; or that he ever paid them rent. Toussaint was at this time living on Hog Island. How long after Charles Chene's death it was, before the farm was sold to La Selle, does not distinctly appear. Francis La Selle, whose testimony is entitled to as much weight, if not more, on that point, as that of any other witness, thinks it was four or five years. Toussaint and Gabriel, no doubt, joined in the deed to La Selle, to cut off their expectant estate in the Jones farm under the substitution; and not on account of any right they had to the possession in Pierre's lifetime. And the fact of Pierre's having a life estate in the Jones farm, is probably the reason why the deed of the St. Jean farm was taken in his name.

Toussaint, it is true, took possession of the St. Jean farm soon after it was purchased; but it was as tenant to Pierre, and not in his own right. He worked the farm, and divided the produce with Pierre, each taking half, for the first two years, when there was a difficulty between

them, and the farm was divided; Toussaint continuing in possession of one half, and Pierre taking possession of the other. In the division of the two years' produce, we hear nothing of Gabriel. Toussaint divided what he raised with Pierre only.

Joseph Campau swears Toussaint often told him the farm belonged to Pierre, his brother.

From the testimony, which is too voluminous to go more into the detail, we have come to the following conclusions:

*First.* That the three brothers, after their father's death, claimed the Jones farm under the substitution from Forville.

*Second.* That, by the substitution, Pierre, who was the eldest brother, was entitled to the farm during his lifetime.

*Third.* That the substitution was intended to be transferred from the Jones farm to the St. Jean farm; and,

*Fourth.* That Pierre Chene allowed Toussaint to occupy and cultivate one half of the St. Jean farm, as a matter of favor, and by way of assisting him and his family, and not as a matter of right.

Pierre, according to the claim of the three brothers, being in his own right entitled to the possession, first of the Jones farm, and afterwards of the St. Jean farm, during his lifetime, was in his own right entitled to the fee simple under the act of Congress, which recognised no right but that of possession or occupancy, as the stock in which the fee was to be ingrafted.

If we are wrong in this, and he could not rightfully take any greater estate than he previously claimed, and that was an estate tail, (for it does not appear what this substitution was, unless it was an estate tail,) the entailment was cut off by the act of March 2d, 1821, abolishing entails, and vesting allodial estates in the tenants in tail. *Laws of* 1833, *p.* 278.

Other questions were raised and discussed, which it is unnecessary to decide, after having given an opinion upon the above points.

Bill dismissed, with costs.